# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
May 19, 2010 Session

## DARRELL JOHN PENNER v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Perry County**
**No. 1009      Timothy L. Easter, Judge**

---

**No. M2009-00670-CCA-R3-PC - Filed September 9, 2010**

---

A Perry County grand jury indicted the Petitioner, Darrell John Penner, for two counts of rape of a child. The Petitioner pled guilty to aggravated sexual battery, and the trial court sentenced him to ten years at 100% in the Department of Correction. The Petitioner filed a petition for post-conviction relief, claiming that he received the ineffective assistance of counsel and that his guilty plea was not knowingly and voluntarily entered. The post-conviction court denied relief after a hearing, and the Petitioner now appeals. After a thorough review of the record and applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which DAVID H. WELLES and JERRY L. SMITH, JJ., joined.

Larry Joe Hinson, Jr., Hohenwald, Tennessee, for the Appellant, Darrell John Penner.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Clark B. Thornton, Assistant Attorney General; Kim R. Helper, District Attorney General; Stacey B. Edmonson, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION
### I. Facts
### A. Guilty Plea

This case arises from allegations that the Petitioner had a sexual relationship with one of his children who was under the age of thirteen. At the Petitioner's guilty plea hearing the

State's attorney summarized the facts underlying the Petitioner's conviction as follows:

> [I]n September 2002, [the Petitioner] had unlawful sexual contact with one of his children, a child under the age of thirteen years old, who had a date of birth of May 12th of 1998. During counseling for the treatment with the counselor, [the Petitioner] informed the counselor, and then who was required by law to notify the authorities of the admission, the Department of Children Services, along with Investigator Barry Carroll with the district attorney's office, began an investigation of the matter. And after being advised of his Miranda warning, [the Petitioner] gave a confession to both the DCS representative and Investigator Carroll admitting that he had had unlawful sexual contact with this child under thirteen years of age.

Pursuant to a plea agreement, the Petitioner pled guilty to one count of aggravated sexual battery, a Class B felony, and the trial court sentenced him to serve ten years in the Tennessee Department of Correction. During the plea hearing, the trial court listed the Petitioner's rights and asked the Petitioner whether he understood them, and the Petitioner responded in the affirmative. Further, the Petitioner testified that he understood he was waiving those rights by moving forward with the negotiated plea agreement. The Petitioner agreed that he understood the elements of the charge against him, the negotiated plea agreement, and the details of the sentence. He stated that he understood the consequences of his plea and the conviction. The Petitioner confirmed that his signature was on both the jury trial waiver and the negotiated plea agreement and that he reviewed both documents with his attorney. Finally, the Petitioner denied any use of alcohol or drugs that might impair his judgment and testified that he was voluntarily entering his guilty plea.

### B. Post-Conviction Hearing

The Petitioner filed a petition for post-conviction relief, and an amended petition, claiming that he received the ineffective assistance of counsel and that his guilty plea was not knowingly and voluntarily entered. The post-conviction court held an evidentiary hearing wherein the following evidence was introduced:

The Petitioner's attorney ("Counsel") testified he represented the Petitioner and negotiated his plea agreement, although he was not present at the hearing where that guilty plea was entered. At the hearing, the Petitioner was represented by Counsel's co-counsel. Counsel recalled that, before the plea negotiations in this case, he received discovery from the State that included: (1) a police interview with the Petitioner that resulted in an admission against interest; (2) a police interview with the Petitioner's wife; and (3) information that the Petitioner "had, or was about to, attend a mental health facility." Counsel could not recall

whether the Petitioner was seeking mental health treatment on his own volition or as a result of a third party request. Counsel learned through communication with the mental health facility that the Petitioner "had a sexual deviancy," and there was concern about his treatment "because he was basically defending himself for his actions." Counsel recalled that after psychological testing the Petitioner was diagnosed as a pedophile and an exhibitionist. The Petitioner was also diagnosed with a generalized anxiety disorder; however, Counsel said "there was nothing to indicate that [the Petitioner] couldn't appreciate right from wrong or he had any serious mental defect." Counsel also testified that he did not notice any mental issues in his interactions with the Petitioner. Based upon this, Counsel did not file a motion to determine the Petitioner's competency. Counsel explained this decision saying, "Based upon my interviews and consultations with [the Petitioner], he seemed very lucid, very – he understood what he was facing, he was able to respond to me in an intelligent manner. And then after I read [the mental health facility] reports, I would not have any factual basis to question his competency."

The Petitioner's post-conviction attorney then provided Counsel an assessment indicating the Petitioner was an individual with "severe and persistent mental illness." Counsel testified that he had never seen the document before and that the document would probably not have changed his case strategy because the Petitioner specifically requested a plea agreement, stating that he did not want to go to trial. Counsel acknowledged, however, that he probably would have investigated further if he had seen this assessment.

Counsel recalled that the Petitioner was charged with two counts of rape of a child, and the Petitioner's wife was charged as a co-defendant. Counsel agreed that there was no physical evidence in this case and that the State's case rested on corroboration testimony. Counsel said that, although another attorney did the research on corroboration testimony, he provided the Petitioner with that research and, after the Petitioner read it, Counsel discussed with the Petitioner the law as it related to the Petitioner's case. Counsel said that he anticipated that the testimony necessary to corroborate the Petitioner's confession would have come from the Petitioner's children, the Petitioner's wife, and church members, to whom the Petitioner's had made incriminating statements. Counsel did not interview the children or the Petitioner's wife, but did review the interview of the Petitioner's wife that the police conducted. The interview revealed that the Petitioner's wife observed the Petitioner, unclothed, take their children into a bedroom and, on another occasion, take the victim outside in the dark without explanation. Counsel explained that he did not interview the Petitioner's family because the Petitioner was adamant he did not want his wife to face a trial or conviction and did not want his children involved in any way. "[The Petitioner] said they had suffered enough, he was trying to protect them."

Counsel testified that he was unaware of any threats made to the Petitioner regarding

the loss of his children in the event he did not cooperate.

On cross-examination, Counsel testified that he had practiced law for thirty-three years. Counsel said that, during his entire representation of the Petitioner, the Petitioner was consistent in his request that Counsel negotiate a plea rather than take the case to trial.

Counsel's co-counsel, who was present at the guilty plea hearing and who conducted the research on corrobation testimony, testified that he worked in Counsel's office and researched accomplice testimony for the Petitioner's case. He also was with the Petitioner on the day he plead guilty:

> [W]e were hoping to enter the plea and get 30 days to respond – to report. I think [the Petitioner] said he had to wrap his business up. We got here that day, I spoke to the District Attorney about it, and we actually researched the law and found that since it was non-probatable offense, that he would not be able to enter the plea that day and then remain free on bond.
>
> However, there was some concern[] that there would be a new judge in January, and the deal was so lenient, that if we went to a different judge, that that judge would not accept the plea bargain and would reject that plea.

Co-counsel also remembered that the Petitioner was nervous when the hearing to accept his guilty plea was moved until after lunch. The Petitioner's reaction did not raise any questions in Co-counsel's mind as to the Petitioner's ability or willingness to plead guilty but, rather, indicated to Co-counsel that the Petitioner was nervous about whether the judge would accept the negotiated plea agreement. Co-counsel did not specifically recall going over the plea agreement with the Petitioner, but maintained that the Petitioner never indicated he did not understand the agreement. Co-counsel testified that had the Petitioner indicated any lack of understanding, Co-counsel would not have allowed the Petitioner to proceed with the guilty plea.

Bill Saul testified that he had known the Petitioner since 1999 and they were part of the same church community. Saul said that the church advocates that its members should submit to laws and the government unless "it would violate our conscience." Saul became aware of the Petitioner's conduct and said that the church community, out of concern for the Petitioner and his family, felt he needed to seek professional help. When asked if the church community had a position on the criminal matter, Saul responded:

> You know, I have a little bit of difficulty in answering that. I don't recall that we sat down and said, "Now, this is the thing for you to do plead guilty," on the basis that he had confessed some sins. What I've heard here

today is new to me; what I've already heard.

But on the basis of what he had confessed to me, well, if that was true, well, then the only thing to do would be to confess guilty.

Saul agreed that the church community would not necessarily want "its dirty laundry aired" but said that the church community would not take steps to prevent it either. Saul agreed that he was present for meetings between Counsel and the Petitioner and did not recall any discussion about whether or not the Petitioner should go to trial. Saul said that it was "advantageous" for the Petitioner to plead guilty rather than go to trial because the incidents would be less public. Saul speculated that the effect of the Petitioner's actions on his family and church community were a significant weight on the Petitioner. Saul recalled hearing that the Petitioner was having difficulty contacting Counsel but was never present for any of those phone calls.

On cross-examination, Saul testified that he never told the Petitioner he needed to plead guilty for the benefit of the community and that he never told him he needed to confess for the benefit of the community.

Susan E. Franks, an investigator with the Department of Children's Services ("DCS"), testified that she investigated allegations that the Petitioner engaged in oral sex with his four-year old daughter. Supporting the allegation were statements from the Petitioner and his wife, who witnessed the first incident when she saw the Petitioner with his penis in the victim's mouth when the victim was four months old.

Franks said that a formal forensic interview was never conducted with the victim, and, when she interviewed the victim at the home, the victim did not disclose anything. A physical examination of the victim was also conducted and the genital exam was normal.

On cross-examination, Franks testified that she had been a DCS investigator for almost thirteen years and, based upon that experience, she has found that, unless the sexual abuse is an acute rape, 95 to 98 percent of the time genital exams come back normal.

Barry Carroll, an investigator for the District Attorney's Office, testified that he interviewed both the Petitioner and his wife about these charges. Carroll stated that he did not find any physical evidence of the charges during his investigation. Carroll denied ever telling the Petitioner that "it would go easier on him if he just accepted it and did what was asked of him" or that, if he did not cooperate, he would lose his children. Carroll said that the extent of his investigation was the interviews and that he was unaware of anyone, other than Franks, investigating the charges.

The Petitioner testified he hired Counsel based upon a recommendation from a deacon from the Petitioner's church. The Petitioner said that he met with Counsel three or four times in his office and twice in court. These discussions all focused on the guilty plea negotiation. The Petitioner stated that it was due to Counsel's "pressure and coercion" that he did not pursue a trial, explaining:

> Well, he was – well, he would just – for one thing, he would never speak of, he would never – never wanted to speak of going to trial. I mean, he would speak about it, but he didn't want to go into it. Like, if I asked him – I remember asking him about it, and he said, "Oh, you don't want to put your daughter on the stand, do you?"

> And I was like, No, I don't want to.

> And then I would try to ask more about it, and he wouldn't even answer my questions; he just – he gave me the cold shoulder, and I couldn't go into it with him.

The Petitioner did not recall Counsel explaining what the State would have to prove in order for a jury to find him guilty of the charges. The Petitioner said that Counsel mentioned corroboration but he did not understand what Counsel was talking about. The Petitioner admitted that he did not ask Counsel to explain it to him but said this was because Counsel was "very controlling," and it was difficult to ask Counsel questions.

The Petitioner testified that he had been a member of the Mennonite community for his entire life and was taught to cooperate with the law and not to hinder it in any way. The Petitioner recalled meeting with Carroll and being advised he had the right to remain silent, but he said he did not understand that. He said he felt "compelled to be there and to speak" based upon the way Carroll presented himself. The Petitioner recalled that Carroll showed him his badge and gun and said, "I'm authorized by the State of Tennessee to use this weapon if necessary. I want to make sure you understand who I am."

The Petitioner said that the investigation regarding these charges began because he was seeking mental health treatment for depression, anxiety, and panic attacks. The Petitioner said that, during the time of the investigation and plea, he was taking antidepressants but did not recall whether he told Counsel he was on medication. During this time, the Petitioner was also attending regular mental health appointments that he initiated with the support of his church. The Petitioner testified that he was diagnosed as manic-depressive with an anxiety disorder, but that, with continued treatment, he had a good prognosis for recovery. The Petitioner said he did not discuss his mental health treatment with Counsel because Counsel

told him, "Your part is to make sure you go to all your appointments, and my part is to negotiate with the D.A."

The Petitioner testified that, from the beginning, Counsel advised that taking a plea agreement was his only option. He also said there was pressure placed on him regarding the charges against his wife:

> [From] my understanding, it came through DCS that I would need to take the guilty plea before they – otherwise they would prosecute my wife and they would put up the children for adoption; you know, basically what I – in my words, "on the open market."...And my wife conveyed this to me, and she was very, very concerned about it, because we were very scared about, you know, the children losing their mother as well.

The Petitioner testified that his church is a very "tight" organization where the church leaders have "authority over the congregation." Church members are obligated to follow the recommendations of the church community and a church member did not do as they instructed, they were subject to excommunication. The Petitioner said that excommunication of a family member would negatively impact the family, and it was not something he wanted for his wife and children.

The Petitioner did not recall any specific conversations with Counsel regarding evidence or discovery. The Petitioner denied ever telling Counsel he wanted to plea or that he was not interested in going to trial. The Petitioner testified that he could not reach Counsel by phone for almost three months. Once he finally reached Counsel, the Petitioner met him at his office and Counsel told him they had reached a plea agreement, and the Petitioner would be going to prison in two days. The Petitioner said:

> And that was the shock of my life right there, because I didn't know anything for several months, hadn't hardly talked to him. . . . he asked if I was ready to go, and I said, "No, I was not interested in taking a plea," and so then they put it off.

The Petitioner admitted that, even though he was on antidepressants at the time, he agreed at the plea hearing that he was not on medication that altered his ability to make a decision. He explained he only agreed because he did not know "the importance of the details." The Petitioner said he did not want to plead guilty but felt he had to in order to protect his wife and children. The Petitioner described his mental state at the guilty plea hearing:

> And one side of me screamed that this is ridiculous, I can't be doing this, this is

not right, I can't believe that I'm being forced into this. And then the other side was screaming back and saying I don't know what else to do; there's not the slightest hope of anybody trying to help me, you know, and go in any other direction.

The Petitioner said that he did not discuss these thoughts with Counsel, explaining these ideas were simply what went through his mind during the hearing.

On cross-examination, the Petitioner agreed that there were four court appearances with Counsel rather than two as he had previously testified, which meant he met with Counsel at least seven or eight times during the course of the case. The Petitioner acknowledged that an employee of DCS never directly told him DCS was going to take his children, and that he was relying on his wife's statements in believing DCS would do so. The Petitioner said he was not sure whether he specifically told Counsel he did not want a plea, but that was what was "in [his] mind." He said that he was intimidated by Counsel, who seemed "very cold and austere," and that he took the plea because he was trying to be "cooperative." The Petitioner agreed that he never requested a new attorney but emphasized that, because he had agreed for Counsel to represent him throughout the proceedings, he thought it was his "Christian duty" to honor that agreement.

The Petitioner agreed that the trial judge reviewed his rights and that the Petitioner, at the guilty plea hearing, testified that he understood the rights, but he explained that he only did so "to get the plea bargain." He felt the plea was his only option. The Petitioner agreed he answered in the affirmative to all of the trial judge's questions about whether he understood the plea, the conviction, and his rights because he felt "that's what was expected of [him]." "I can't say I didn't have any understanding, but it was my intention to take the plea bargain and that was, you know, because I didn't know what else to do."

At the conclusion of the hearing, the post-conviction court took the petition under advisement and later issued an order denying post-conviction relief. It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends Counsel failed to provide effective assistance and his conviction is the result of an involuntary plea. The State responds that Counsel's performance was not deficient and that the Petitioner's guilty plea was knowingly and voluntarily entered.

In order to obtain post-conviction relief, a petitioner must show that his or her

-8-

conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). Upon review, when post-conviction proceedings have included a full evidentiary hearing, as was true in this case, the trial judge's findings of fact and conclusions of law are given the effect and weight of a jury verdict, and this Court is "bound by the trial judge's findings of fact unless we conclude that the evidence contained in the record preponderates against the judgment entered in the cause." *Black v. State*, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). Thus, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial court judge, not the appellate courts. *Momon v. State,* 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State,* 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's conclusions of law, however, are subject to a purely de novo review by this Court, with no presumption of correctness. *Fields v. State,* 40 S.W.3d 450, 457 (Tenn. 2001).

### A. Ineffective Assistance of Counsel

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail

on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. *House*, 44 S.W.3d at 515 (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)). However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. *House*, 44 S.W.3d at 515.

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

The Petitioner argues that Counsel did not completely explain the corroboration requirements for accomplice testimony or protect the Petitioner's due process rights by making sure the State could establish corroborating evidence to support the Petitioner's confession. In regard to this issue, the post-conviction court found:

> The proof at the evidentiary hearing establishes that the State had sufficient
> evidence to independently corroborate the Petitioner's confessions. According

to the DCS investigator, the Petitioner's wife had observed him having oral sex with the victim. Smith and Wood were aware of this eye witness testimony as well as the information that the Petitioner had confessed to other members of his community. This Court is satisfied that had this matter proceeded to trial the State would very likely have been able to succeed in getting this independent evidence before the fact finder which would have resulted in a conviction of Child Rape.

On all disputed issues between [Counsel], Wood and the Petitioner on this issue, the Court finds [Counsel's] and Wood's testimony more credible. They did what they were asked to do - get the Petitioner the best plea agreement they could and avoid a trial.

Our review of the record supports the conclusions of the post conviction court. The Petitioner admitted to his church community, family, and investigators that he had engaged in sexual conduct with his daughter, the victim. The Petitioner's wife also gave statements consistent with the Petitioner's confession. She said that she had seen the Petitioner engage in oral sex with the victim when she was an infant. Further, she witnessed the Petitioner take her daughters into a bedroom unclothed. On another occasion, she witnessed the Petitioner take the victim outside in the dark without explanation. The Petitioner was also diagnosed, based on mental health testing and assessment, as a pedophile and an exhibitionist, which is consistent with his admissions and the charges against him. While a conviction cannot be supported solely on uncorroborated admissions to a crime, it requires only "slight evidence" which may be either direct or circumstantial, to corroborate a confession and sustain a conviction. *State v. Alec Joseph Mesot*, No. M2006-02599-CCA-R3-CD, 2008 WL 732151, at *3 (Tenn. Crim. App. March 14, 2008) *no perm. app. filed*; *State v. Ellis*, 89 S.W.3d 584, 600 (Tenn. Crim. App. 2000).

As to Petitioner's claim that Counsel did not explain corroboration testimony to him, the Petitioner testified that Counsel spoke with him about corroborative evidence, but he did not understand it and did not seek further clarification of the information or tell Counsel he did not understand. The post-conviction court found Counsel's testimony was credible and found that the Petitioner had not demonstrated by clear and convincing evidence that Counsel's representation rose to the level of ineffective assistance or that it prejudiced the Petitioner. We conclude the evidence does not preponderate against the post-conviction court's findings. The Petitioner is not entitled to relief on to this issue.

### B. Guilty Plea

The Petitioner next contends his guilty plea was not knowingly and voluntarily entered

due to his mental illness and pressure placed upon him to protect his family.

When evaluating the knowing and voluntary nature of a guilty plea, the United States Supreme Court has held that "[t]he standard was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31(1970). The court reviewing the voluntariness of a guilty plea must look to the totality of the circumstances. *See State v. Turner*, 919 S.W.2d 346, 353 (Tenn. Crim. App. 1995); *see also Chamberlain v. State*, 815 S.W.2d 534, 542 (Tenn. Crim. App. 1990). The circumstances include:

> [T]he relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

*Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993) (*citing Caudill v. Jago*, 747 F.2d 1046, 1052 (6th Cir. 1984)). A plea resulting from ignorance, misunderstanding, coercion, inducement, or threats is not "voluntary." *Id.*

In the case under submission, the post-conviction court found:

> After a close review of the transcript of the plea hearing, it appears the Trial Court was very thorough in his explanations of the various rights of the Petitioner and the rights that the Petitioner would be giving up by pleading guilty. The transcript does not reveal that the Petitioner did not understand these rights.

> The record establishes that trial counsel explained the plea agreement and the resulting consequences to the Petitioner before the Petitioner entered his plea.

> Additionally, it does not appear from the record that the Petitioner's plea was the result of pressure or force to accept the plea agreement. The Petitioner's current position on this point is inconsistent with the credible testimony of the Petitioner's trial counsel as well as the Petitioner's admissions to the trial judge at the time he entered his plea that his actions were knowingly and voluntarily made. The Petitioner's remarks made at the plea hearing indicate that he was fully aware of the nature and the consequences of the plea and that he made a knowing, intelligent, and voluntary decision to accept the agreement.

-12-

At the Petitioner's guilty plea hearing, the Petitioner testified that his plea was voluntarily made. Counsel testified that he reviewed the Petitioner's mental health records and there was nothing to indicate incompetency and, furthermore, based on his own interaction with the Petitioner he found no basis to question th Petitionre's competency. Counsel described the Petitioner as lucid and recalled that the Petitioner's responses to Counsel were intelligent, which is consistent with the Petitioner's responses to the trial court during his guilty plea hearing. The post-conviction court found the Petitioner's responses to the trial court at his plea hearing reflected his understanding of his rights. The Petitioner acknowledged that he testified at the guilty plea hearing that he understood the plea, sentence, and conviction. He explained to the post-conviction court that he pled guilty not because he "didn't have any understanding," he intended to take the plea because he did not know what else to do.

The Petitioner relies specifically on an unsigned document stating that the Petitioner was "a person with severe and persistent mental illness" to support his claim that his plea was involuntary due to mental incompetency. This document was introduced at the post-conviction hearing through Counsel who testified that he had never seen it. There was no testimony, expert or otherwise, explaining the document, where it came from, who administered the test it documented, or how its contents would relate to the Petitioner's competency to enter a guilty plea. Thus, the evidence of record does not preponderate against the post-conviction court's findings, but supports the findings of fact and conclusions of law reached by the post-conviction court.

Finally, the Petitioner claims that his plea was not voluntary because "he was under great strain from those whom he wanted to protect." The post-conviction court specifically accredited Counsel's testimony that he was unaware of any threats made to the Petitioner in regard to the loss of his children. Further, the post-conviction court found the Petitioner's testimony at the guilty plea hearing credible when he testified that his plea was voluntary. It is not the province of this court to re-weigh a trial court's credibility determination, as that decision is best made by the trial court. *State v. Holder*, 15 S.W.3d 905, 912 (Tenn. 1999). Moreover, there was no evidence introduced at the post-conviction hearing, other than the Petitioner's statements, supporting coercion from DCS or the District Attorney's investigator. Co-counsel testified that he reviewed the plea agreement with the Petitioner prior to the plea, and the Petitioner did not indicate he did not understand. The Petitioner also testified that he did not tell Co-counsel or Counsel that he did not want to plead guilty or did not understand the plea, the conviction, or his rights. Finally, we note that at the guilty plea hearing the trial court was very thorough in its explanation of the Petitioner's rights. The Petitioner testified that he understood and stated that he was entering the plea voluntarily.

Following our review of the record, we conclude that the Petitioner has failed to establish that the proof preponderates against the findings made by the post-conviction court that his plea was entered knowingly and voluntarily.

### III. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the post-conviction court properly dismissed the Petitioner's petition for post-conviction relief. Accordingly, we affirm the judgment of the post-conviction court.

_____

ROBERT W. WEDEMEYER, JUDGE
